UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

PETROLEUM HELICOPTERS, INC.,     )
          Plaintiff,      )
                      )
     vs.                )      1:05-cv-0410-LJM-WTL
                      )
ROLLS-ROYCE CORPORATION,      )
          Defendant.     )

**ORDER ON DEFENDANT'S, MOTION TO STRIKE TESTIMONY OF WARREN WANDEL, MOTION FOR SUMMARY JUDGMENT, AND MOTION TO EXCLUDE CERTAIN OPINIONS OF WARREN WANDEL**

This cause is now before the Court on defendant's, Rolls-Royce Corporation ("Rolls-Royce"), Motion to Strike Expert Testimony of Warren V. Wandel, Motion for Summary Judgment, and Motion to Exclude Certain Opinions of Warren Wandel.  Plaintiff, Petroleum Helicopters, Inc. ("PHI"), opposes all of the motions.  In this case, PHI claims that Rolls-Royce breached its contractual warranty as to the negligent or improper assembly or manufacture of a helicopter engine. The damages occurred after an electrical component in an engine control unit failed in a PHI-owned helicopter.  PHI sued, and settled with, the manufacturers of the failed component, the circuit board into which the component was placed, and the control unit into which the board was placed.  Rolls-Royce contends that there is no material question of fact that it did not breach its contractual warranties.  PHI disagrees.

After consideration of the parties' arguments, and for the reasons stated herein, the Court **GRANTS** Rolls-Royce's Motion to Strike, **GRANTS** Rolls-Royce's Motion for Summary Judgment, and finds that Rolls-Royce's Motion to Exclude Certain Opinions of Warren Wandel is **MOOT**.

# I.  **BACKGROUND**[1]

## A.  THE UNDERLYING ACCIDENT & ORIGINAL LAWSUIT

On or about June 27, 2003, Eddie Brown, Jr. ("Brown"), filed a lawsuit in the U.S. District Court for the Southern District of Texas, Galveston Division, against PHI.  Brown later amended his complaint to include ten defendants, including PHI and Rolls-Royce (the "Texas action").  Brown's claims arose from PHI's emergency landing in the Gulf of Mexico on or about May 11, 2003, of a Model 407 helicopter, registration N491PH (the "accident helicopter"), manufactured by Bell Helicopter ("Bell") (the underlying accident, the "Accident").

On or about July 28, 2004, PHI cross-claimed in the Texas action for contribution against Rolls-Royce and other defendants including Kemet Electronics Corp. ("Kemet"), International Creative Data Industries, Inc. ("ICDI"), Goodrich Pump and Engine Control Systems, Inc. ("GPECS"), Coltec Industries, Inc. ("Coltec"), BF Goodrich Aerospace ("BF Goodrich"), Chandler Evans Control Systems ("CECS"), Goodrich Corporation ("Goodrich"), and Bell.  From Rolls-Royce, PHI sought contribution for the other defendants' cross-claims against PHI, sought damages in the amount of $272,400.42 as a result of Rolls-Royce's alleged breach of contract and/or warranty, and sought attorneys' fees.  Def.'s Summ. J. Exh. 1.

The parties to the Texas action, including PHI and Rolls-Royce, entered into a Full and Final Release and Settlement Agreement ("Texas Settlement Agreement").  Hicks Aff. ¶ 3.  The Texas

---

[1]The Court notes that it was difficult to follow the page references for several of Rolls-Royce's exhibits because the pages of the exhibit did not appear in numerical order.  *See, e.g.*, Def.'s Summ. J. Exh. 2, Wandel Dep. (the seven-page exhibit showing deposition pages numbered as follows:  111, 1, 110, 104, 109, 105, 107).  The Court could determine no logical reason for such occurrences, but endeavored to find the appropriate material within the exhibit rather than exclude it in its entirety.

Settlement Agreement settled and released all claims asserted by the Texas action plaintiffs against all defendants and all of the cross-claims asserted by the defendants against one another, with the narrow exception of PHI's breach of contract and/or warranty claim against Rolls-Royce. Hicks Aff. ¶ 4 & Exh. A. On May 6, 2005, the Texas court entered an Agreed Final Judgment. Hicks Aff. ¶ 4 & Exh. B.

On March 16, 2005, the Texas court, upon motion by Rolls-Royce, severed PHI's contract-based cross-claim and transferred the claim to this Court. Def.'s Summ. J. Exh. 7.

## B. THE AGREEMENT BETWEEN PHI & ROLLS-ROYCE

On or about July 3, 1997, PHI and Rolls-Royce entered into a Power By The Hour Master Agreement (the "Agreement"). First Am. Compl., Exh. 2. Under the terms of the Agreement, Rolls-Royce agreed to repair, overhaul, test, or exchange unserviceable Rolls-Royce Model 250-C47 helicopter engines owned by PHI, subject to certain requirements imposed on PHI, including monthly payments. *Id.*, Art. III. The Agreement covered both scheduled and unscheduled repairs. *Id.*

The Agreement provided that

[t]itle and risk of loss and damage to any new or repaired serviceable parts and accessories incorporated into an Engine Unit in accordance with this Agreement shall pass to [PHI] upon delivery to the final destination of such parts and accessories or incorporation of such parts and accessories into the Engine Unit whichever occurs first.

*Id.*, Art. III., ¶ G. According to PHI, this clause would include the FADEC and its component parts. Block Aff. ¶ 4. Similarly, the Agreement provided that "[p]arts and accessories removed and

3

replaced during repair become the property of [Rolls-Royce] upon dispatch to [Rolls-Royce] or their

[sic] Approved Repair/Overhaul Facility."  First Am. Compl., Exh. 2.

The Agreement includes the following warranty clause:

THIS AGREEMENT SUPERCEDES THE APPLICABLE 250-C47 WARRANTIES, AND IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

EXCEPT AS OTHERWISE PROVIDED HEREIN, THE LIABILITY OF [ROLLS-ROYCE] TO [PHI] UNDER THIS AGREEMENT IS LIMITED TO THE REPAIR OR REPLACEMENT OF ENGINES OR ENGINE PARTS IN ACCORDANCE WITH THE TERMS THEREOF.

[ROLLS-ROYCE] SHALL BE LIABLE FOR ANY CLAIMS ARISING OUT OF OR IN CONNECTION WITH THE ASSEMBLY OR MANUFACTURE OF ENGINES WHERE THE OPERATOR CAN DEMONSTRATE THAT ANY ENGINE HAS BEEN NEGLIGENTLY OR IMPROPERLY ASSEMBLED OR MANUFACTURED.

IN NO EVENT SHALL [ROLLS-ROYCE] BE LIABLE TO [PHI] FOR ANY LOSS OF REVENUE OR INCREASED OPERATING COSTS OR DISRUPTION TO OPERATIONS ARISING OUT OF OR IN CONNECTION WITH EQUIPMENT UNSERVICEABILITY AND OR DELIVERY DELAYS.

[ROLLS-ROYCE] SHALL HAVE NO LIABILITY UNDER THIS AGREEMENT FOR FAILURES, MALFUNCTIONS, DEFECTS OR NONCONFORMITIES OF ENGINES OR ENGINE PARTS ATTRIBUTABLE IN WHOLE OR IN PART TO [PHI'S] FAILURE TO PRESERVE, INSTALL, OPERATE, MAINTAIN, REPAIR, REPLACE OR ALTER THE SAME IN ACCORDANCE WITH APPLICABLE RECOMMENDATIONS BY [ROLLS-ROYCE] OR ATTRIBUTABLE IN WHOLE OR IN PART TO ABUSE OR NEGLECT BY [PHI], FORTUITOUS EVENT OR ACT OF GOD, IN TRANSIT OR IN STORAGE BY [PHI].

*Id.*, Art. XII.  The terms "negligently," "improperly," "assembled," and "manufactured" are not

defined in the Agreement.

4

In the instant suit, PHI claims that Rolls-Royce's negligent manufacture and/or assembly of the accident helicopter's engine and its related components directly or proximately caused the failure of that engine. *Id.* ¶ 18. Therefore, PHI asserts, Rolls-Royce breached the warranty and is liable to it for its damages and liable to the Texas suit plaintiffs for the amount of their claims against PHI. *Id.* ¶¶ 14-27. In addition, PHI claims that Rolls-Royce is liable to PHI for its reasonable attorneys fees pursuant to Chapter 38 of the Texas Civil Practices & Remedies Code and the common law of the State of Texas. *Id.* ¶¶ 29-31.

## C. HISTORY OF THE ACCIDENT ENGINE & ITS PARTS

At the time of the Accident on May 11, 2003, the accident helicopter was equipped with a Rolls-Royce Model 250-C47B engine bearing Serial Number CAE 847-82 (the "Accident Engine"). Wandel Rep. (Apr. 10, 2006), at 3 ("Wandel 2006 Rep."); Scheurich Aff. ¶ 6. The Accident Engine, like other Model 250-C47B engines, incorporates a Full Authority Digital Electronic Control ("FADEC") unit, which when engaged automatically controls fuel flow to the engine under various flight conditions. Wandel 2006 Rep. at 1; Scheurich Aff. ¶ 10 & Exh. A, at 1-9. A FADEC unit consists of two parts, the Electronic Control Unit ("ECU"), which analyzes inputs and commands a particular fuel flow setting, and a Hydro Mechanical Unit ("HMU"), which carries out those commands. Scheurich Aff. Exh. A, at 1-9. The ECU in the Accident Engine bore Serial Number JG8ALK0471 (the "Accident ECU"). Wandel 2006 Rep. at 3.

The Accident ECU was manufactured by a component manufacturer and incorporated into the Accident Engine after the engine was originally assembled by Rolls-Royce. Scheurich Aff. ¶ 7 & Exhs. B-E. The precursor to the Accident Engine was manufactured and assembled by Rolls-

5

Royce, sold to Bell, and shipped to Bell in September 1996. *Id.* ¶¶ 7-8. When Rolls-Royce shipped the precursor engine to Bell it contained an ECU bearing Serial Number JGALK0079 (the "0079 ECU"). *Id.* ¶ 8. From the time that Rolls-Royce shipped the precursor engine to Bell in the fall of 1996 to 2001, eleven different ECUs had been installed in the engine. *Id.* ¶ 12. The Accident ECU was installed in the Accident Engine in October 2001. *Id.* ¶ 18. Each of the ECUs underwent various inspections and maintenance procedures, including upgrades and modifications. *Id.* ¶ 12. The precursor engine itself was installed in eight different helicopters before it was ultimately installed in the N491PH, the accident helicopter, in March 2003. *Id.* ¶ 18.

According to PHI, the component parts of the Rolls-Royce engine Model C47B is composed of numerous component parts that are freely interchangeable. Block Aff. ¶ 5. The removal and replacement of discrete engine components occurs on a nearly daily basis at PHI and other helicopter operators. *Id.* Even a FADEC's component parts are interchangeable, including the ECU unit. *Id.* The removal and installation of ECU units on PHI helicopters is a normal business practice at PHI. *Id.* The removal and replacement of ECU units is accomplished by unplugging the ECU unit and unbolting it from the airframe. *Id.* A replacement ECU is installed by bolting it to the airframe and then plugging in the respective cables. *Id.* None of these actions require, or permit, PHI personnel to modify, alter or come into contact with any of the ECU's internal components. *Id.*

The Accident ECU contained many component parts itself, including a C321 SMT capacitor ("chip capacitor" or the "capacitor") manufactured by Kemet. Scheurich Aff. ¶ 13. ICDI installed the chip capacitor on a circuit board, which ICDI then sold to GPECS. *Id.* ¶ 14. GPECS then manufactured the Accident ECU in March 1998. *Id.* ¶ 15. On March 17, 1998, GPECS shipped the

Accident ECU to Rolls-Royce. *Id.* ¶ 16.  On May 28, 1998, the Accident ECU was shipped to Bell
and was installed in a different engine than the Accident Engine. *Id.* ¶ 17.

On May 24, 1999, and again on April 4, 2000, GPECS performed upgrades on the Accident
ECU.  Wandel Dep. at 104-05.  The Accident ECU was ultimately incorporated into the precursor
to the Accident Engine on or about October 6, 2001.  Scheurich Aff. ¶ 18.  The Accident ECU and
the Accident Engine were installed into the accident helicopter in March 2003, and remained there
until the accident occurred on May 11, 2003.  *Id.* ¶¶ 11, 18.


## D. THE ACCIDENT

On May 11, 2003, PHI employee Skip Fleming ("Fleming") piloted the accident helicopter
with three passengers from an offshore platform en route to Morgan City, Louisiana.  Fleming Dep.
at 5, 72-73, 82.  During cruise flight over the Gulf of Mexico at about 800 feet altitude, Fleming
heard the FADEC fail aural warning sound followed very closely by the low rotor speed ("RPM")
horn.  Fleming Dep. Exh. 3.  In addition, the FADEC fail and FADEC caution lights also
illuminated.  *Id.*  Fleming understood at this point that the FADEC unit had failed.  Fleming Dep.
at 85.  Fleming also understood that the FADEC unit was equipped with "direct reversion to manual"
software.  *Id.* at 85-86.  Fleming understood that to mean that "in the event the FADEC . . . can no
longer maintain control of [the] HMU . . . it automatically will, after a short period of time, give you
manual control of the throttle without any pilot action required." *Id.* at 86.  Nevertheless, Fleming
was not able to manually control the accident helicopter during or after the FADEC failure and
performed an emergency landing that resulted in the aircraft damage that PHI seeks recovery for in
this suit.

## E.  POST-ACCIDENT TESTING ON THE FADEC

GPECS performed post-accident tests on the FADEC to determine why it failed.  Pl.'s Exh.

3, GPECS Rep. S-1734.  Based on those tests, the GPECS report opines:

> The shortened capacitor C321 was severely damaged due to the high current condition created.  Because of the damage . . . the root cause of the component defect cannot be identified. . . .  The most likely root cause scenario of the component defect is it was damaged in earlier processing (handling or thermal shock) resulting in a fracture that perpetuated over time, resulting in the internal capacitive plates shorting together. . . .

*Id.* at 2.

There is no dispute that the failure of capacitor C321 caused the engine's FADEC to fail.

## F.  PHI'S EXPERT OPINION

In his April 2006 report, PHI's expert, Warren W. Wandel ("Wandel"), opined:  "The cause

of the engine power loss was an internal electrical failure in the [ECU] of the FADEC system,

specifically a short circuit for undetermined reasons."  Wandel 2006 Rep. at 9.  Wandel testified

during his September 7, 2006, deposition that the most likely root cause of the chip capacitor defect

that was the cause of the short circuit was damage caused during handling that caused a fracture that

perpetuated over time.  Wandel Dep. at 1, 107.  He based this opinion on GPECS' report of its

analysis of the ECU.  *Id.*  Wandel did not see any of the FADEC components himself.  *Id.* at 109.

Wandel further testified the damage to the capacitor could have occurred "anytime the unit was

opened up."  *Id.* at 110.  Wandel noted that "nobody is authorized to open it up other than Rolls-

Royce and GPECS."  *Id.*  Wandel testified that he did not know if Rolls-Royce had ever opened up

8

the capacitor but, based on its report, Wandel knew that GPECS had. *Id.* at 110-111. The following colloquy also transpired during Wandel's deposition:

> Q. (BY MR. YEAGER) So with regard to this capacitor, what, if anything, would you say that Rolls-Royce did that was wrong?
>
> * * *
>
> A. Well, just off the bat, I would say that [it] accepted a design that allowed there to only be one of them in there, and there was no redundancy in this whole system.

*Id.* at 111.

By affidavit dated October 19, 2006, Wandel opined that Rolls-Royce had actual knowledge of the potential failure of an internal ECU chip capacitor prior to the date that Rolls-Royce assembled the ECU involved in this accident. Wandel Aff. ¶ 11. Wandel states: "Specifically, Rolls[-]Royce obtained actual knowledge of the potential for an ECU chip capacitor failure on May 18, 1998, and did not assemble the ECU at issue in this lawsuit onto engine CAE 847310 until May 28, 1998. *Id.* There are no citations to documents that support Wandel's opinion in paragraph 11 of his affidavit. *Id.* Wandel also opines in his affidavit that Rolls-Royce failed to meet the appropriate standard of care in its manufacture and assembly of the Accident Engine. *Id.* ¶ 12.

## II.  **MOTION TO STRIKE**

In support of its opposition to Rolls-Royce's Motion for Summary Judgment, PHI submits an affidavit of its expert, Wandel. Rolls-Royce contends that paragraphs 9 through 12 of Wandel's affidavit fail to satisfy the requirements of Federal Rule of Evidence 702 ("Rule 702"), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In addition, Rolls-Royce argues that

9

some portions of Wandel's affidavit are inadmissible for other reasons.  Rolls-Royce has moved to dismiss the allegedly inadmissible paragraphs.

Similarly, in its Motion to Exclude Certain Expert Opinions of Warren V. Wandel, Rolls-Royce asserts that Wandel is not qualified to offer opinions on the design of the engine in question or the design of the Accident ECU.  Rolls-Royce also avers that Wandel's opinion that an intermittent short occurred in the Accident ECU is speculative and/or unsupported by admissible evidence, therefore, it is unreliable and inadmissible.  In addition, Rolls-Royce contends that paragraph 12 of Wandel's affidavit is both unreliable and inadmissible.  Finally, Rolls-Royce asserts that to the extent Wandel's opinions regarding causation in his affidavit conflict with his deposition testimony and/or the opinions stated in his supplemental report, his affidavit opinions should be excluded.

Because Rolls-Royce's arguments on both motions are so closely related and effect the Court's ruling on the admissibility of Wandel's opinions for purposes of summary judgment, to the extent the arguments overlap, the Court addresses them simultaneously under the standards for admissibility of expert testimony.  Under Rule 702 and *Daubert* the Court follows a two-prong framework:  (1) the Court must determine whether "the proposed witness would testify to valid scientific, technical, or other specialized knowledge and (2) [the Court must determine whether] his testimony will assist the trier of fact."  *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (quotations and citations omitted).  The first prong "of this framework evaluates the reliability of the testimony."  *Id.*  To determine whether Wandel's opinions are reliable the Court "'must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable.'"  *Id.* (quoting *Zelinski v. Columbia 300, Inc.*, 335

10

F.3d 633, 640 (7th Cir. 2003)).  The Court must "reject 'any subjective belief or speculation.'"  *Id.* (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)).

Under the second prong, the Court "evaluates the testimony's relevance."  *Id.*  The opinion may assist the trier of fact with any issue involved in the case; the expert need not opine about the ultimate issue.  *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  An expert may opine as to the hypothetical or probable causes of an event if such testimony would aid the jury.  *Id.* at 718-19.  However, the hypothetical alternative must itself have an analytically sound basis such that it is more than mere speculation.  *Id.* at 719 (citing *DePaepe v. Gen'l Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)).  The Court may not decide if the expert's opinion is correct, rather it must only determine whether the expert's testimony is pertinent to an issue in the case.  *Id.*

Rolls-Royce seeks to exclude the following paragraphs from Wandel's affidavit:

9.      "After reviewing the evidence, including the Goodrich Pump & Engine Control Systems, Inc. Report S-1734, it is my opinion that the most likely cause of C321 capacitor's failure resulted during the manufacturing process, through either improper handling or thermal shock.

10.     "After reviewing additional evidence, including a Rolls Royce Incident Report Closure that was first produced on October 19, 2006, it is my opinion that Rolls Royce had actual knowledge of at least one other ECU that failed in flight because of thermal damage to a chip capacitor as of May 18, 1998.

11.     "Thus, it is my opinion that Rolls Royce had actual knowledge of the potential for a failure of an internal ECU chip capacitor prior to the date that Rolls Royce assembled the ECU involved in the incident that forms the basis of this lawsuit.  Specifically, Rolls Royce obtained actual knowledge of the potential for an ECU chip capacitor failure on May 18, 1998, and did not assemble the ECU at issue in this lawsuit onto engine CAE 847310 until May 28, 1998.

11

12.     "It is my opinion that the National Transportation Safety Board's December 15, 2004[,] Safety Recommendation A-04-68 and -69 that ['] . . . until primary FADEC system reliability is significantly improved, a reliable and effective backup system is necessary to ensure safe operation of the Bell 407 helicopter['] was correct.  Further, it is my opinion that Rolls Royce's manufacture and assembly of its Series IV, Model 250-C47B engines, prior to May 11, 2003, without a reliable and effective backup system was improper and failed to meet the appropriate standard of care. . . ."

Wandel Oct. 19, 2006, Aff. ¶¶ 9-12 (footnotes omitted).

PHI contends that Wandel is qualified to testify to the opinions in his affidavit as an air-accident investigator with over thirty years of experience in the U.S. Army, Bell, the National Transportation Safety Board ("NTSB"), and his own company, Warren V. Wandel & Associates. In other words, Wandel's opinions are only of the same type that he would have given as an air-accident investigator, therefore, they are admissible.  This includes, PHI asserts, recommendations to manufacturers about the redesign and incorporation of redundant safety-of-flight-related systems and/or components.  Pl.'s Resp. to Mot. to Strike at 5-6 (citing Wandel Dec. 21, 2006, Aff.).

With respect to paragraph 9 of Wandel's October 19, 2006, affidavit, PHI asserts that Wandel relied upon the GPECS report to make this conclusion and that Rolls-Royce itself has relied upon the content of that report.  Although the Court agrees that Wandel is qualified based on his experience to testify as to the cause of the accident, the Court disagrees with PHI that Wandel may opine as to the reason the Accident ECU failed.  Wandel may rely upon the GPECS report to make his own conclusions about why the accident occurred; however, there is nothing in his experience that would render him an expert on the matters contained in the GPECS report.  In other words, Wandel may rely upon the report to render an opinion about what caused the accident, as he would in any other accident investigation in which he participated, but there is nothing in his experience

12

that would render him qualified to opine about why a particular electronic component failed.  *Cf. Smith v. Ford Motor Co.*, 882 F. Supp. 770, 772 (N.D. Ind. 1995); *Hoban v. Grumman Corp.*, 717 F. Supp. 1129, 1134 (E.D. Va. 1989).  For this reason, the conclusion in paragraph 9 of Wandel's affidavit is unreliable.  Because the opinion is unreliable, the Court is not convinced that it would assist the trier of fact determine whether or not Rolls-Royce breached the warranty of the Agreement. The Court concludes that paragraph 9 of Wandel's October 19, 2006, affidavit should be struck.

Rolls-Royce also argues that the Court should strike paragraphs 10 and 11 of Wandel's October 19, 2006, affidavit because the conclusions are either facially erroneous or unreliable.  In those paragraphs, Wandel opines that because a chip capacitor of an engine failed on May 18, 1998, Rolls-Royce had actual knowledge of the potential for the Accident ECU's chip capacitor to fail on May 28, 1998, the date that Rolls-Royce shipped the Accident ECU.  According to the affidavit, Wandel bases this opinion on a Rolls-Royce Incident Closure Report.

PHI contends that Wandel compared the incident reports from the May 18, 1998, incident and that from the May 11, 2003, incident, which are very similar.  Wandel assumed that the investigatory process for both incidents followed the same time line.  Because Rolls-Royce completed its investigation of the May 11, 2003, incident within three days, Wandel concluded that Rolls-Royce completed the investigation of the May 18, 1998, incident in the same time frame. Moreover, PHI asserts that Rolls-Royce has failed to produce relevant documents related to the May 18, 1998, incident, therefore, Wandel's conclusion is justified.

The Court concludes that Wandel has failed to support his conclusion with evidence; therefore, it is speculative and will not assist the trier of fact.  Upon review of the pertinent incident reports, the Court agrees that the failure mode of the capacitor on the ECU from the May 18, 1998,

incident is similar to that of the capacitor from the Accident ECU.  However, there is nothing in Wandel's affidavit or report or deposition testimony that supports his leap from this similarity to his conclusion that Rolls-Royce had actual knowledge of the failure mode of the Accident ECU before shipping it to PHI.  In point of fact, there is no evidence, save PHI's statements in its briefs, that this is in fact how Wandel reached his conclusion.  To the extent that PHI seeks admission of Wandel's conclusion as a sanction for Rolls-Royce's alleged discovery abuses, the Court finds that the matter has not been properly raised.  For these reasons, the Court strikes paragraphs 10 and 11 of Wandel's October 19, 2006, affidavit.

Rolls-Royce seeks to strike paragraph 12 of Wandel's October 19, 2006, affidavit as well. Rolls-Royce contends that in this paragraph, PHI seeks to introduce portions of the NTSB report, which are inadmissible under 49 U.S.C. § 1154.  Moreover, there is no basis provided for Wandel's independent assessment of Roll-Royce's engine design.  Even if the Court concludes that Wandel may offer an opinion based on the NTSB report, Rolls-Royce argues that the Court should omit the opinion because the probative value of the opinion is far outweighed by the danger of unfair prejudice or confusion to the jury.  PHI asserts that the NTSB's Safety Recommendation letter quoted by Wandel is admissible.  Even if it is not admissible, Wandel is entitled to rely upon inadmissible evidence to formulate his conclusions and, in any event, facts from the NTSB report are admissible.

The Court concludes that paragraph 12 of Wandel's October 19, 2006, affidavit is inadmissible.  Under 49 U.S.C. § 1154(b), "No part of a report of the [NTSB], related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report."  The purpose of this statute is to prevent

14

embroiling the NTSB in controversial issues, preserve the impartiality of the NTSB, to prohibit the presentation of opinion testimony, and to prevent the NTSB's reports from usurping the function of the jury.  *See* 49 C.F.R. § 835.1; *Universal Airline v. E. Air Lines*, 188 F.2d 993, 1000 (D.C. Cir. 1951).  Despite PHI's argument that the NTSB's Safety Recommendation letter is not a report and, therefore, is not rendered inadmissible by statute and regulation, PHI itself continually characterizes the letter as a report.  Moreover, the statement PHI seeks to admit is clearly an opinion of the NTSB, which by regulation, is exactly the kind of information the statute is designed to keep out of a trial. 49 C.F.R. § 835.1 (stating that "[t]he purpose of this part is . . . to prohibit the discovery of opinion testimony").  Finally, although PHI contends that Wandel is allowed to use inadmissible evidence to form his own opinion, Wandel's affidavit provides no basis, other than the NTSB's conclusion, for how he reached the same conclusion of the NTSB.  Although the Court would agree with PHI that Wandel's similar conclusion would be admissible if he reached it from a review of all the evidence related to the accident, admission of the NTSB's opinion in the guise proffered in paragraph 12 is improper.  For these reasons, the Court finds that paragraph 12 of Wandel's October 19, 2006, affidavit should be struck.

## III.  SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-

68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure

56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact and that the moving party
> is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may

not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth

specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  A genuine issue

of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The

nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v.

Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the

record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party

bears the responsibility of identifying the evidence upon which she relies.  *See Bombard v. Fort

Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  When the moving party has met the

standard of Rule 56, summary judgment is mandatory.  *See Celotex*, 477 U.S. at 322-23; *Shields

Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable

inferences from undisputed facts in favor of the nonmoving party and should view the disputed

evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d

254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to [its] case, one on which [it] would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## IV. <u>DISCUSSION</u>

### A.  CHOICE OF LAW

This is a breach of contract case in which the Agreement between the parties specifies that it "shall be governed by and construed according to the law of the State of Indiana . . . ."  Am. Compl. Exh. 2, Art. XV.  Indiana "favors contractual stipulations as to governing law."  *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002).  There is no dispute that Indiana law applies to PHI's claims under the Agreement.

Under Indiana law, "construction of a written contract is a question of law . . . ."  *Orthodontics Affiliates, P.C. v. Long*, 841 N.E.2d 219, 222 (Ind. Ct. App. 2006).  Terms of a contract are given their plain and ordinary meaning, unless they are ambiguous.  *See Four Winds, LLC v. Smith & DeBonis, LLC*, 854 N.E.2d 70, 74 (Ind. Ct. App. 2006), *trans. denied*.  "Where the terms of a contract are clear and unambiguous, they are conclusive, and [the Court] will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions."  *Arrotin Plastic Mat'ls of Ind. v. Wilmington Paper Corp.*, ___ N.E.2d ___, No. 02A04-0609-CV-512, 2007

WL 1345604, at *2 (Ind. Ct. App. May 9, 2007) (citing *Four Winds*, 854 N.E.2d at 74).  In such a

case, the Court determines the intent of the parties from the four corners of the contract.  *Id.*

Contract terms are "'ambiguous only where a reasonable person could find its terms susceptible to

more than one interpretation.'"  *Id.* (quoting *Cummins v. McIntosh*, 845 N.E.2d 1097, 1104 (Ind. Ct.

App. 2006), *trans. denied*).  The meaning of ambiguous terms is a question of fact.  *Id.*  Any contract

ambiguity is construed against the drafter of the Agreement.  *Time Warner Entm't Co. v. Whiteman*,

802 N.E.2d 886, 894 (Ind. 2004).  "'The terms of a contract are not ambiguous merely because the

parties disagree as to the proper interpretation of the terms.'"  *Arrotin Plastic Mat'ls*, 2007 WL

1345604 at *2 (quoting *Four Winds*, 854 N.E.2d at 74).


## B.  THE MERITS

Rolls-Royce contends that, as required under the warranty, PHI cannot establish that Rolls-

Royce negligently or improperly assembled or manufactured the Accident Engine.  In addition,

Rolls-Royce argues that PHI's contention that it was negligent because of the engine's design

characteristics is not covered under the warranty.  Finally, Rolls-Royce asserts that the only claim

at issue is the warranty claim; PHI's contribution and attorneys' fees claims were part of the

settlement of the Texas case.

To the contrary, PHI contends that it need only prove that anyone improperly or negligently

manufactured the Accident Engine.  PHI asserts that the undisputed evidence shows that the

Accident Engine's capacitor caused the resultant damages, therefore, summary judgment in its favor

is appropriate on its claim for breach of warranty.  In addition, PHI avers that the language of the

warranty can be construed to cover design flaws, which PHI contends is an alternative reason that

Rolls-Royce was negligent.  Moreover, PHI asserts that all of its cross claims against Rolls-Royce were transferred to this suit.

The Court agrees with Rolls-Royce that under the plain language of the warranty, it is liable for PHI's damages only if PHI can show that Rolls-Royce negligently or improperly assembled or manufactured the Accident Engine; there is no provision that warrants the engine's design.  The pertinent paragraph of the warranty reads:  "[ROLLS-ROYCE] SHALL BE LIABLE FOR ANY CLAIMS ARISING OUT OF OR IN CONNECTION WITH THE ASSEMBLY OR MANUFACTURE OF ENGINES WHERE THE OPERATOR CAN DEMONSTRATE THAT ANY ENGINE HAS BEEN NEGLIGENTLY OR IMPROPERLY ASSEMBLED OR MANUFACTURED."  First Am. Compl., Exh. 2, Art. XII.  There is no need to resort to a dictionary to determine the plain meaning of the phrase "negligently or improperly assembled or manufactured."  The terms "negligently" and "improperly" have their ordinary meanings of "without ordinary care" or "not correct."   Those adjectives modify two verbs "assembled" and "manufactured."  Those terms have common meanings in any lexicon and do not encompass the verb "designed."

The Court also finds unpersuasive PHI's argument that Rolls-Royce "negligently or improperly assembled or manufactured" the Accident Engine because the Accident ECU failed and the cause of its failure was in manufacture.  PHI contends all that it needs to prove is that the Accident Engine was "negligently or improperly assembled or manufactured," therefore, summary judgment on liability in its favor is appropriate.  In other words, PHI argues that Rolls-Royce is liable under the warranty provision for negligence by any entity that "assembled or manufactured" the

accident engine at any time.  PHI asserts that this is the plain meaning of the warranty language.  The Court cannot agree.

The only admissible evidence is that the cause of the Accident ECU's failure was undetermined, but that "the most likely root cause scenario for the component defect is it was damaged in earlier processing (handling or thermal shock) resulting in a fracture that perpetuated over time . . . ."  Scheurich Aff., Exh. B, at Bates No. Rolls Royce 002557.  Therefore, there is no admissible evidence that ties any one entity to the part's failure.  Rather, PHI asks the Court to impose liability on Rolls-Royce just because there was a part failure.  As pointed out by Rolls-Royce, this argument is one that falls either under  the negligence doctrine of *res ipsa loquitur* or under the rubric of strict liability .  For purposes of this discussion, the Court will presume that under the warranty at issue here, Rolls-Royce can be held liable under either theory.[2]

In Indiana, under either *res ipsa loquitur* or strict liability , PHI must have evidence to show that the Accident ECU's defective condition was unaltered after leaving the control of Rolls-Royce. *See Greeno v. Clark Equip. Co.*, 237 F. Supp. 427, 430-31 (N.D. Ind. 1965) (discussing the similarity of the standard in Indiana law between strict liability for product defects and liability under the negligence doctrine of *res ipsa loquitur*).  The doctrine of *res ipsa loquitur* can only "be applied where the injuring instrumentality is shown to have been exclusively under the management and control of the defendant or his servants and the accident is such as in the ordinary cause of things does not happen if those who have the management and control use proper care." *Hammond v. Scot Lad Foods, Inc.*, 436 N.E.2d 362, 364 (Ind. Ct. App. 1982).  PHI asserts that it has shown that it

---

[2]According to some courts the availability of strict liability for product defects between business entities when a limited warranty is involved is debatable. *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 927-28 (9th Cir. 1979).

never accessed the components of the FADEC, including the Accident ECU, therefore, the internal

components could only have become irreparably damaged while under the control of Rolls- Royce

or its approved suppliers.  But this argument presumes that the Accident ECU failed because of the

manufacturing or handling by Rolls-Royce or its suppliers.  PHI's expert, Wandel, testified that the

failure of the capacitor proved that "either [there was] a defect in the component or it had been

mishandled at some point."  Wandel Dep. at 110.  This is consistent with GPECS' findings, which

concluded that "the root cause of the component defect cannot be identified. [. . .] The most likely

root cause scenario of the component defect is it was damaged in earlier processing (handling or

thermal shock) resulting in a fracture that perpetuated over time."  Scheurich Aff. Ex. B at Rolls

Royce 002557.  Although PHI repeatedly avers that it was unable to access the capacitor due to a

tamper-resistant seal, it has presented no evidence that the capacitor could not have been damaged

by its employees mishandling the ECU.  PHI's Director of Engine & Component Overhaul, Michael

Block ("Block"), stated that the "removal and reinstallation of ECU units on PHI helicopters is a

normal business practice at PHI."  Block Aff. ¶ 5.  While the ECU was in the exclusive control of

PHI, it is possible that it could have been mishandled or subject to thermal shock during various

removals and reinstallations.

Not only does PHI's argument hinge on an unsupported presumption, but the argument also

fails because PHI cannot establish that Rolls-Royce had exclusive control over the object.  Again,

Block stated that the "removal and reinstallation of ECU units on PHI helicopters is a normal

business practice at PHI."  Block Aff. ¶ 5.  This practice shows that PHI had great autonomy in its

uses of ECU units and precludes a finding that the Accident ECU was in the exclusive control of

Rolls- Royce.  Because PHI must establish that Rolls-Royce had exclusive control over the Accident

ECU and it cannot, PHI cannot succeed in defeating summary judgment on the theory of *res ipsa loquitur*.

Under the rubric of strict liability, PHI must prove that: (1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left Rolls-Royce's control; and (3) the defective condition was the proximate cause of PHI's injuries. *See Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007) (citing *Coffman v. PSI Energy, Inc.*, 85 N.E.2d 522, 527 (Ind. Ct. App. 2004)). PHI has not proved that the Accident ECU was defective or unreasonably dangerous, nor has it proved that the defective condition existed at the time the product left Rolls-Royce's control. In its brief, PHI repeatedly claims that the evidence establishes that the Accident Engine was manufactured or assembled improperly. The Court cannot agree. The only evidence presented that addresses the cause of the defect that led to the accident states that the cause of the  defect cannot be identified and the most likely cause is thermal shock or improper handling. *See* Scheurich Aff. Ex. B at Rolls Royce 002557; Wandel Dep. at 110. Either thermal shock or improper handling could have occurred while the Accident ECU was in the control of PHI. There is no evidence presented that shows the defect existed at the time the Accident ECU left Rolls-Royce's control, regardless of how PHI characterizes the evidence on record. PHI never addresses the possibility that simple mishandling or events leading to thermal shock could have occurred while the Accident ECU was in the exclusive control of PHI.

PHI also claims that Rolls-Royce knew of other capacitor failures and then failed to incorporate a reliable and effective back-up system into the FADEC system. To support this claim, PHI cites to the now-stricken paragraphs of Wandel's affidavit. Without these paragraphs of the affidavit, PHI has no evidence that Rolls-Royce knew of other capacitor failures prior to the

22

manufacture of the Accident ECU and this claim is unsupported.  However, the report Wandel referred to in the stricken paragraphs refers to an incident on May 18, 1998.  Wandel Dep. Ex. C. While it is true that this incident was ten days before the Accident ECU left Rolls-Royce's control, it is not true that this means Rolls-Royce had knowledge that the incident was a result of a capacitor failure.  The Incident Report for the May 18, 1998, incident was not completed until December 8, 1998.  *Id.*  The Court cannot infer from this Incident Report that Rolls-Royce knew there was a capacitor failure before shipping the Accident ECU.

PHI appears to argue that the warranty provision extends to *any* claims arising our of or in connection with the assembly or manufacture of engines where it can demonstrate that any engine has been negligently or improperly assembled or manufactured, and that this extends to include PHI's negligence.  The warranty provision itself is a limitation on Rolls-Royce's liability.  First Am. Compl. Exh. 2, Art. XII.  It would not make sense for a limitation on liability for negligent or improper assembly or manufacture to extend to PHI's negligence.  When interpreting a contract, the Court determines the intent of the parties from the four corners of the contract.  *See Millsaps v. Ohio Valley Heartcare, Inc.*, 863 N.E.2d 1265, 1270 (Ind. Ct. App. 2007).  Rolls-Royce's intent could not have been to extend liability to cover PHI's own negligence, especially when viewed under the section title "Warranty and Limitation of Liability."  First Am. Compl. Exh. 2, Art. XII.

PHI has failed to present direct evidence showing Rolls-Royce's negligence or improper assembly or manufacture of the engine and has also failed to present evidence to create an inference of negligence through the rubrics of *res ipsa loquitur* or strict liability.  As such, PHI has failed to meet its burden on summary judgment and a reasonable factfinder could not find that Rolls-Royce

breached the warranty provided in the contract, and the Court **GRANTS** Rolls-Royce's Motion for Summary Judgment on the breach of warranty claim.

Because the claim is now dismissed, Rolls-Royce's Motion to Exclude Certain Expert Opinions of Warren Wandel is moot.

Rolls-Royce also claims that it is entitled to summary judgment on PHI's claims for indemnity and attorney's fees.  Rolls-Royce contends that the Texas Settlement Agreement specifically released all claims except the "hull claim," which was labeled as PHI's "breached contract/warranty" claim.  *See* PHI's Cross-Complaint, 4-5.  PHI claims that it did not waive its claims by entering into the Texas Settlement Agreement and that it is entitled to indemnity for the settlement amount it paid in the Texas Settlement Agreement and is entitled to attorney's fees accumulated through the underlying personal injury suit and its cross-claims against Rolls-Royce, all pursuant to the warranty provision.

The language in the warranty provision allows liability to attach to Rolls-Royce if the "OPERATOR CAN DEMONSTRATE THAT ANY ENGINE HAS BEEN NEGLIGENTLY OR IMPROPERLY ASSEMBLED OR MANUFACTURED."  PHI's First Am. Compl., Ex. 2 at Art. X11 (emphasis in original).  As discussed above, PHI had not been able to demonstrate that Roll-Royce negligently or improperly assembled or manufactured the Accident Engine.  As such, the warranty is not implicated on this set of facts and PHI is not entitled to indemnification nor attorney's fees.  Rolls-Royce's Motion for Summary Judgment on PHI's claims for indemnification and attorney's fees is **GRANTED**.

## V. **CONCLUSION**

For the reasons stated herein, defendant's, Rolls-Royce, Motion to Strike Expert Testimony of Wandel is **GRANTED** and its Motion for Summary Judgment is **GRANTED**.  Defendant's Motion to Exclude Certain Opinions of Warren Wandel is **MOOT**.  All claims are **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED this 2nd day of August, 2007.


LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to:

Michael Ross Cunningham
ROSE WALKER LLP
rcunningham@rosewalker.com

Scott A. Harkness
NORRIS CHOPLIN & SCHROEDER LLP
sharkness@ncs-law.com

Bruce L. Kamplain
NORRIS CHOPLIN & SCHROEDER LLP
bkamplain@ncs-law.com

Adrienne Franco Busby
BAKER & DANIELS
afbusby@bakerd.com

Pamela C. Hicks
BEIRNE MAYNARD & PARSONS
phicks@bmpllp.com

William Lee Maynard
BEIRNE MAYNARD & PARSONS LLP
wmaynard@bmpllp.com

Martin E. Rose
ROSE WALKER LLP
mrose@rosewalker.com

Joseph H. Yeager Jr
BAKER & DANIELS
jhyeager@bakerd.com